Good morning, everyone. We have five arguments on today's schedule. We begin with Appeal Number 22-1116, Gail Stockton v. Milwaukee County, it's Department of Corrections. And 22-116, Gail Stockton v. Milwaukee County, it's Department of Corrections. would be sufficient for Monel liability, even if none of the individual defendants here are liable. I think there needs to be an underlying constitutional deprivation. And I apologize, because I feel like we are maybe ships passing on the night here. But in this case because it's postured as a N.A.A. case. There needs to be a showing of deliberate indifference by some official by some actor. There has to be a constitutional injury. When you go back to Los Angeles v. Heller, the Supreme Court talks about that you can have a policy in that case that dealt with use of force. You can have a policy that would allow for unconstitutional use of force, but the Supreme Court literally said it's besides the point. But our case law has said you can have a widespread practice or widespread policy, which Monel says, that is the cause of the constitutional violation. Even if you don't have any individuals who are identified as liable. We've said that in Thomas. We've said that multiple times. I think conceptually that's right. I think it's certainly in the abstract, but from a practical standpoint. And I guess where I'm going with this is I'm not arguing that an individual defendant that's in the case needs to be found constitutionally responsible in order to open up a Monel claim. I understand that in concept. There could be some other actor that's out there. My argument is that regardless of who did it, any employee, any contractor, nobody violated Mr. Madden's constitutional rights. That's correct. Not the named defendants, not anyone else. That's correct, and that's what the district court concluded. And that's the primary threshold question. And that's why the district court didn't dig into all these other issues, because if the court were to answer that question the same way the district court did, the Monel issue is done. Okay, what about Mr. Surjack's point, though, that the facility has had a long established practice of problems with the provision of health care, including in some of the very areas that Mr. Madden's case implicated? So, I don't think there's evidence of that. Certainly there is evidence... Of cardiac care. There's certainly evidence of staffing issues. And, again, as I said... Staffing probably contributed to the delinquent or late response to the sick call tickets. I think that's pure speculation. There were actually fewer sick call... When the court's speaking about the October 25th sick call, the evidence shows that there were actually fewer sick call slips that week than in the prior weeks when they responded relatively quickly. The point to your question, I think, is really touching on causation. So, again, Mr. Madden... This case is not about an inmate who was sitting for weeks waiting for health care, sitting for weeks waiting for a prescription to be filled. And we've seen those cases. That's the Thomas case and it's others. That's not this case. For the first 14 days, he is seen just about daily by medical professionals as he's experiencing symptoms. Now, the estate is essentially trying to fashion a malpractice claim into Section 1983. The estate wants to point the finger at the nurse practitioner and saying, you should have done more. You should have ordered more testing. Those are things that are appropriate for a medical malpractice case. But in a deliberate indifference Section 1983 case, the point is he was seen. The medical providers were there. They evaluated him and they provided care to him. Mr. Hall, can I ask you about Officer Pasecki? He's one of your clients. He is. Okay. So, it surprised me in your red brief to see you say that even viewing... I'm looking at page 45. Even viewing the evidence in the estate's favor, the facts do not support an inference that Pasecki intended to use force in a way that would cause harm to Madden on October 28th. How do you align that with the testimony of the two nurses? I mean, I don't see how you can possibly reconcile that. So, fundamentally, when we look at the use of force claim against Pasecki, the estate tries to point to three different things. They point to the use of profanity. They point to Pasecki allegedly lifting Mr. Madden up by his shoulder. Forget that. Go to what Nurse LaTrenta and Adriano testified to. So, in that situation, we have Mr. Madden seated on the ground and allegedly taking the version most favorable to the plaintiff. Mr. Madden is leaning against Pasecki, and the nurses believe that Pasecki purposefully takes a step away from him, causing him to fall to the ground. And hit his head after he had already fallen and hit his head once. Correct. Fundamentally, it's not clearly established that that's even a use of force. There is no case law. So, you think the district court got that wrong? I think there's an open question as to whether that's a use of force. Wait, wait, wait. Isn't your better argument, though, that there's no analogous case and that there would be an analogous case required in that situation? That it could be, even if it was a use of excessive force? There is no doubt about it. I mean, this is a qualified immunity defense. How do you deal with the U.S. Supreme Court's decisions in Hope v. Pelzer and Taylor v. Riojas? Because you couldn't find a similar case there either. Sure. But, okay. So, Hope v. Pelzer involved an Alabama prison inmate who was latched to a hitching post in 90 to 100 degree heat, wasn't provided water. The warden provided a water bucket for his dog right next to the- They argued there's no similar case and the Supreme Court said forget it. I understand that. But that seems to be a very, very different fact pattern and how egregious and clearly egregious that was compared to somebody who allegedly takes a step away from an individual who's seated on the floor. No one's even claiming that Mr. Madden fell from a standing position. At this point, he's seated on the floor and the allegation is that Pisecki steps away. Well, it was a little bit more than that. It was that he moved intentionally so he would fall after he'd already hit his head once. That is the allegation. Not just innocently stepped away. You say allegation. There's testimony. Right? It's more than just people alleging that. Okay? Let me give you the answer that Nurse LaTrenta provided in her deposition. I'm reading it right to you. Once Officer Pisecki had assisted Madden over the door as he waited for the wheelchair, he purposely allowed him not once but twice to fall and hit his head. This is somebody that watched it happen. It's not just some allegation. We don't know whether it happened or not. No, and on the summary judgment review, the facts have to be taken in the light most favorable to the plaintiff and we accept that. That's why, I mean, certainly the strongest argument is qualified immunity. And that's why it's really important that this is being treated as an Eighth Amendment case. Let me give you a hypothetical. Suppose that there were two correctional officers that were helping an inmate out of a cell, kind of like you'd help an injured athlete off a field. You know what I mean? Where you kind of put your arm around the shoulder and you help him out. And one of the officers says to another, let's drop him. Let's drop him. And they do it, pounds his head on the concrete. And they lift him up and they're walking him a few more feet and they say drop him again. Can't find a case that says you can't do that. You can search the federal reporter, search the U.S. reports, you're not going to find a similar case. Is that a problem? How do you evaluate that hypothetical? It is a case where qualified immunity ought to apply because the exception that the court notes, the Hope v. Pelzer exception, is applied exceedingly rare. And Hope v. Pelzer was a horrible case. What about Taylor v. Riojas? You can't find a case that having an inmate live in his own waste and sewage violates the Constitution. The court said, of course you can't. It's obvious. Your Honor, I think it's a qualified immunity case. It is also a de minimis use of force. Mr. Madden was subject to an autopsy. There's no claim of a head injury. There's no head injury found. There was no contusion. Nothing like that. And so, again, I think I'm not here to argue with the court as to whether or not it, as a matter of law, violates the Eighth Amendment or doesn't. Look, you make a good point on there's a damage issue here because, unfortunately, this fellow was, it looks like the heart issue was going to take his life. But the Eighth Amendment also, unlike the Fourteenth and Fourth Amendment, contemplates de minimis use of force. And in cases involving Eighth Amendment uses of force, when there isn't injury, some would even say significant injury, those are traditionally not actionable under the Eighth Amendment. And, again, Mr. Madden was subject to an autopsy. With that, I respectfully request the court to affirm. Thank you. Very well. Okay. Mr. Reardon? Good morning. May it please the court, I represent Armour Correctional Health, Nurse Adriano and Nurse Practitioner Mahaga. I think Attorney Hall was correct in saying that this is a medical malpractice case. This is not a 1983 action case. The arguments by plaintiff's counsel rely solely on their experts' testimony. There is no evidence to infer that Nurse Mahaga knew or inferred that Michael Madden had infective endocarditis. And we know from the case law that an expert's testimony regarding unreasonable treatment does not equate to conscious disregard. So you can't make the leap from this expert testimony to Nurse Mahaga having conscious disregard for the health care of Mr. Madden. In fact, on October 14th, Mr. Madden came in, complained of diarrhea, not tolerating jail diet, and unable to sleep. There was no complaints of chest pain, no complaints of fever, no complaints of chill, fatigue, or joint ache. All of the elements allegedly of infective endocarditis. And I think what is really telling is that the plaintiff is not suing Nurse Adriano for deliberate indifference when in fact she did find chest pain and fever. I don't know how you can say one individual was deliberately indifferent with regard to the care of the same individual the next day, when the symptoms were more severe or on point the day previously. And I think that also undercuts any Monell claim, because there's no pattern. There's no pattern or custom if in fact you say that Nurse Adriano is not deliberately indifferent, but Nurse Mahaga is. That doesn't make any sense. Also, with regard, I think, to the October 25th claim regarding the allergy in the electronic record, it indicates that Mr. Madden said, I have severe allergies, my prescriptions are old, I need a new prescription for my allergies. There was no complaint of chest pain, no complaint of fever, no complaint of any type of element that you would associate with infective endocarditis. What about the argument that if they had seen him on that, given the increasing severity of his heart condition, that they would have identified it and treated it? Again, I think that's speculative, and two, you're relying on an expert's testimony that is rebutted by another expert. Is that enough to get an issue of fact? I don't think with regard to deliberate indifference, no. Maybe to medical malpractice, but not to deliberate indifference. In this particular case, you have a series of individuals evaluating the same patient that came up with a diagnosis or finding of dehydration. And there are facts to support dehydration. He was not drinking. He had diarrhea. He was not eating. In fact, on October 11th, when he came in with the same symptoms, they applied some solution, they gave him some fluids, and he bounced back. He comes in on the 13th with the same complaints. He has chest pain, but however, he indicates to Nurse Adrino that he has GERDs, which causes chest pain. And the chest pain is not steady. In fact, it's indicated that it's intermittent. It's not strong, but it's sharp at times, which is very symptomatic or very similar to complaints of GERD. So what we're arguing here is actually a medical malpractice case. Did they come up with the right diagnosis? Not whether they were deliberately indifferent, because they did treat this individual. They looked into his symptoms. They assessed him. They took information from him in order to determine what the problem was. Mr. Reardon, set aside the way the case has been litigated for a second. I know that's a big ask. That's okay. I got in the middle of this one, so I can set it aside easily. All right, set it aside, and set aside the district court opinion. Okay. What's the proper legal standard? Fourteenth Amendment, objective unreasonableness, or Eighth Amendment, deliberate indifference? What's the proper legal analysis of that? I think with regard to Mercy Mahogany's Eighth Amendment. In fact— No, no, no. It shouldn't turn upon a defendant, right? It's going to turn upon the 1983 plaintiff here, right? Correct. Right, whether he's been convicted, serving a sentence, or whether he's a pretrial detainee. And the oddity of this case is that it's this probation violation. I think the case— And the reason I'm asking you this, and the reason I interrupted you— I'm sorry. No, no, no. I should apologize, not you. The reason I asked you that is when you're saying it's not deliberate indifference, it looks more like medical malpractice. Well, the moment that we change the legal framework, and we say, let's analyze it under pretrial detainee Fourteenth Amendment standards, right? That doesn't help your client. That hurts your client, arguably. It makes it easier, I think, for the plaintiff to prove— Right, Mr. Surjack's case gets better. But it doesn't take it out of medical malpractice. No, that's right. They're not one and the same there. What do you think the right answer to this is? It's difficult when we get the briefs, we see the district court opinion. It's just a foregone conclusion that it's Eighth Amendment, apparently. It's not that clear to me. I don't disagree with you that it's kind of a foregone conclusion that it's Eighth Amendment. However, in this instance, I believe that issue regarding the Fourteenth Amendment was waived. But given the fact that it's being discussed, I think the fact, the circumstances involved here, as I think Attorney Surjack has indicated, kind of lead it to an Eighth Amendment claim. Why is that? Because in Miranda, we said in 2018, Miranda versus County of Lake, that pretrial detainees received Fourteenth Amendment consideration, not Eighth Amendment, for medical issues. And the question is, is Mr. Madden considered a pretrial detainee here when he is brought in on a probation violation that hasn't been adjudicated yet? I think that is a tricky question. I don't think he is. Why? I think if, in fact, he's a pretrial detainee, he's not in the situation he is. There is more, I was going to say, you don't essentially slap somebody in jail. It's a pretrial detainee. You keep them there for that amount of time. That's not true. You may. There are certain circumstances. There are many defendants who, while awaiting trial, are in jail for a long time. I think in this circumstance, though, we have a parole violation in which— That hasn't been adjudicated. It hasn't been adjudicated, but I'm kind of at a loss for words. I don't think Madden actually forced the issue regarding whether he was a pretrial detainee or not. I think that they almost gave it up. So I think that's why we're stuck here with the Eighth Amendment. No, I know. I mean, look, we're trying to solve something. I don't know that it's solvable. I mean, a case hasn't been litigated this way at all. It hasn't. And to be fair, I don't know that our law is clear on this situation. When somebody's picked up on a parole violation, do you consider them a pretrial detainee versus convicted on the underlying conviction? I think the case law is split, so I think that you can go either way. But I think in this particular instance, it has been tried and prosecuted as an Eighth Amendment case. There's a backdrop principle to this, too, and that is that people can waive constitutional rights. It may not be a good idea, but you can do it. I would agree with that as well. You can do it. Most. So that's an issue for brighter minds than mine as to where that line is drawn. But I think in this particular case, the line has been drawn, and it's the Eighth Amendment in this particular case. Because of waiver. Yes. Thank you. Yeah, of course. Mr. Surjak. You've got five minutes. Thank you, Your Honors. And with respect to the issue that we were just discussing most recently, I agree that we did say, even applying the Eighth Amendment standard, that there's a constitutional violation. But that's because we've always looked at this as so much more than a medical malpractice case, Your Honors. And the reason why counsel— You didn't say even applying. You said the Eighth Amendment should apply. I believe in a footnote in the lower court, we said even applying the Eighth Amendment standard. But you never advocated for the Fourteenth Amendment standard, at least from what—unless I'm missing something. Please tell me if I'm missing something. That's true, because we believe under any view of the evidence under the Eighth Amendment standard, there was sufficient evidence for this to be decided by a jury. Now, what counsel is raising is this Nurse Adriano visit on October 13th. Now, of course, on October 13th, Nurse Adriano knows it's chest pain, and she knows that Mr. Manning is experiencing a fever. What she does to prove that she was not deliberately indifferent, she's only a registered nurse. She's not a provider. She's not an advanced-level provider. So she schedules a visit with the advanced-level provider, who is Mercy Mahaga. And so Mr. Manning goes to Mercy Mahaga for an evaluation on October 14th— it still is probably not deliberate indifference here. But let me ask you a question. I'm much more interested in Mr. Piusecki or Officer Piusecki, and my question is this. If there is no analogous case under the Eighth Amendment, and we find here that there's a constitutional duty to— by the way, I watched the video. The elevator video is very hard to watch. What happened to Mr. Manning, there's no dispute, is terrible. It's horrible. It's tragic. But if we find that there's a constitutional duty to prop up an ailing prisoner of guard, has a constitutional duty not to not drop someone but to actually prop somebody up, what limit can we impose upon that? Hope says it's very limited where we say there's no analogous case, and Taylor says that there's a cell in an individual covered with feces, and it's so obvious that you can't have that. Is this one of those cases? And if it is, what's the limit that we impose upon prisoner of guards? You have to prop this person up but not this person. You have to assist this person but not this person. How do we write it? Yes. The requirement that the plaintiff is asking for is not a duty to prop up. It's a duty or responsibility not to maliciously and sadistically cause harm. Now, when he's seated, Mr. Manning is seated. Well, then you would establish, but that's not the testimony. The testimony is that he's seated. He's leaning up against Officer Piasecki's legs, and Officer Piasecki moves, which causes him to hit his head on the floor, right? If we accept the testimony, that's the testimony. I know that's disputed, and if it goes to trial, you may win or lose on that. I don't know. But I think that's the testimony, that Mr. Manning leaning up against him, Piasecki moves, and Mr. Manning falls from a seated position and hits his head on the floor. Yes, but it needs to be in the context that he was transporting Mr. Manning and let him go before, causing Mr. Manning to smash his head on the wall. So after Mr. Manning smashed his head on the wall, Officer Piasecki propped Mr. Manning up on his legs at the same time that he was screaming at him, calling him a piece of shit to get the fuck up, and then he removed his legs. Now, in terms of excessively and sadistically causing harm, we believe the facts fit right into the analysis of Eighth Amendment cases. More specifically, as we cited in the brief, the use of force in a situation where someone's actively dying, and it was apparent that this man was actively dying, every officer would have been on notice of that based on the law in this circuit that already existed. Now, turning, I only have a minute left, but with respect to Nurse Practitioner Mahaga and this court's existing case law on a deliberate indifference claim by a health care provider, we're entitled to present circumstantial evidence that Nurse Practitioner Mahaga did know of the risk of infective endocarditis to Mr. Manning. That's very clear in the Petty's case that this court previously decided, and we know that at the time that Nurse Practitioner Mahaga evaluated Mr. Manning on October 14th, two medical emergencies in the past three days had been called for this man's chest pain that he was evaluating, evaluated by Nurse Practitioner Mahaga with respect to the chest pain that he was experiencing. Now, she says she doesn't know what a common medical abbreviation, CEP, meant, that she didn't ask anybody about what that meant. She didn't ask Mr. Manning. She didn't know anything about it. That's why she didn't review his records. Under this court's law, if she's not acting as a health care provider would act in these circumstances, and she's acting in a blatantly inappropriate fashion, that's enough to create circumstantial evidence of deliberate indifference. That's what we believe exists here. Thank you, Your Honors. Okay, very well. Mr. Sorjak, thank you. Mr. Hall, Mr. Reardon, thank you. The case will be taken under advisement.